COURT OF APPEALS
DECISION
DATED AND FILED

June 22, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP2058**

Cir. Ct. No. **2007ME248**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

IN THE MATTER OF THE MENTAL COMMITMENT OF X. Z. B.:

OUTAGAMIE COUNTY,

   PETITIONER-RESPONDENT,

 V.

X. Z. B.,

   RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Outagamie County: EMILY I. LONERGAN, Judge. *Reversed*.

¶1 STARK, P.J.[1] Xander appeals orders entered under WIS. STAT. ch. 51 extending his involuntary commitment and subjecting him to involuntary

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

medication and treatment.[2] Xander argues the evidence was insufficient to support the circuit court's conclusion that he is dangerous. In response, Outagamie County argues this appeal is moot because the orders in question have expired. In the alternative, the County argues the evidence was sufficient to support the court's determination of dangerousness.

¶2 Assuming without deciding that this appeal is moot, we nevertheless conclude that it falls within multiple exceptions to the mootness doctrine, and we therefore choose to address the merits of Xander's arguments. As explained in greater detail below, we agree with Xander that the evidence was insufficient to support the circuit court's finding of dangerousness under WIS. STAT. § 51.20(1)(a)2.c. That subdivision paragraph required the County to prove that there was a "substantial probability" of physical impairment to Xander or to other individuals. *Id.* A "substantial probability" does not exist under § 51.20(1)(a)2.c. if the subject individual "may be provided protective placement or protective services under [WIS. STAT.] ch. 55."

¶3 It is undisputed that at all times relevant to this appeal, Xander was subject to a WIS. STAT. ch. 55 protective placement. The County did not, however, introduce sufficient evidence at the extension hearing to prove, by clear and convincing evidence, that the ch. 55 exclusion in WIS. STAT. § 51.20(1)(a)2.c. did not apply to Xander. Accordingly, the County failed to prove that Xander was dangerous under that subdivision paragraph. We therefore reverse the order

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials.

extending Xander's WIS. STAT. ch. 51 involuntary commitment, as well as the associated order for involuntary medication and treatment.

## BACKGROUND

¶4 Xander has been involuntarily committed under WIS. STAT. ch. 51 since November 2007, when an initial commitment order was entered for a period of six months. Thereafter, twelve additional orders were entered, each of which extended Xander's commitment for a twelve-month period. The last of those orders was set to expire on May 11, 2020.

¶5 On March 20, 2020, the County filed another petition seeking to extend Xander's commitment. The circuit court held a hearing on the County's petition, at which two witnesses testified—psychiatrist Marshall Bales and social worker Kathy Nyman.[3]

¶6 Bales testified that he had been assigned by the circuit court to examine Xander. Based on that examination, Bales testified that Xander has "a very long-standing diagnosis" of "chronic severe" schizophrenia. Bales stated Xander's schizophrenia has "been treatable, but he does have some break-through psychotic symptoms." Specifically, Bales testified that Xander reported "hear[ing] voices once in a while, … and he will act on those hallucinations as well periodically." Bales further stated that Xander "gets this injectable

---

[3] The record contains two different spellings of the social worker's last name. The proper spelling appears to be Nyman.

We also observe that in addition to testifying at the extension hearing, Bales prepared a report regarding Xander. That report was not introduced into evidence at the extension hearing, however, and we therefore do not consider it. *See **Langlade Cnty. v. D.J.W.**, 2020 WI 41, ¶7 n.4, 391 Wis. 2d 231, 942 N.W.2d 277.

antipsychotic, and it is reported repeatedly that before he gets his shot, the medicine by shot wears off, and he will get more irritable and psychotic for that week." Bales testified Xander also takes oral medication to treat his condition.

¶7 Bales acknowledged that Xander was subject to a guardianship and a protective placement under WIS. STAT. ch. 55. He further testified that Xander was "well placed" in a group home pursuant to his protective placement. Nonetheless, Bales testified that there have been periods when Xander has regressed in his treatment, "even with careful supervision, even with them making sure he takes his medications." In particular, Bales testified that one or two months earlier, Xander "got psychotic," heard voices, and tore wallpaper off the wall in his room. Bales also testified that Xander had urinated in someone's bed "a few months ago," either out of anger or psychotic thinking. Bales stated, "[S]o that's the concern even with protective placement and even with medications and he still has these occasional episodes that occur .... [T]hat is why he needs continued oversight."

¶8 Bales testified that the earliest record he reviewed regarding Xander dated from 2001. When asked to describe Xander's historic "level of dangerousness," Bales responded that "the dangerousness has mainly been difficulty caring for basic needs, but he can get threatening and assaultive at times." When pressed by the County to identify recent instances of threatening or assaultive behavior, Bales responded:

> Well, I don't know of any examples other than what I've said, and in his current placement with oversight, he does okay, but he, he will—if he's in a, a nonstructured setting, he will use street drugs and alcohol. He will become problematic, but with his current placement, he's actually well placed. He's been known to be sexually inappropriate, to be intrusive, psychotic, and it's been literally decades of this.

4

¶9      The County then asked Bales to identify "what … the current danger is to [Xander] within the circumstances surrounding his diagnosis," and Bales responded:

> He's not—I know of no major violent acts over the last year with, other than what I've said. There's been no suicide attempts, no assaults, no hospitalizations psychiatrically to his credit, but I believe that is with treatment and with structure. Now he's placed in this group home under his guardianship with protective placement, but in my opinion, the commitment provides extra support and safety for him and the medication order.

Ultimately, Bales opined that Xander would be a proper subject for commitment if treatment were withdrawn, stating: "I just believe that there's going to be dangerousness in some way, whether that he relapses with alcohol or he, thoughts of excitement and then it will be a hospitalization, police contact, criminal activity, jail, something."

¶10     Bales also opined that Xander was not competent to refuse medication. He testified staff at the group home had reported that Xander has to be prompted to take his medications and "certainly will not take [them] on his own free will." Bales subsequently clarified that in the recent past, although Xander had forgotten to take his medications or needed to be prompted to do so, he had not outright refused to take them.

¶11     Nyman, a social worker employed by the County, testified that she had worked with Xander for approximately ten years, meeting with him every four to six months. Nyman testified that during the prior year, Xander had shown "some aggression" toward staff and his peers at the group home. Nyman then elaborated that Xander had engaged in property damage when he was upset by

turning over a picnic table and destroying a yard statue, and that he had stolen lawn chairs from his peers.

¶12     Nyman also testified that Xander "struggles with polydipsia"—i.e., excessive thirst—and "often when he is drinking, taking many fluids, he … will become irritable and aggressive and then engage in bizarre behavior."  As examples of that behavior, Nyman cited Xander's hiding food and coffee grounds in his room and tearing wallpaper off his wall.  Nyman also stated that Xander had "pulled a door off the hinges" and "threatened staff a while back," which resulted in a disorderly conduct ticket in 2018.

¶13     On cross-examination, Nyman acknowledged that Xander was under a guardianship and protective placement, as a result of which he could receive reminders to take his medications, even absent a WIS. STAT. ch. 51 commitment. Nevertheless, Nyman expressed concern that without a commitment and associated involuntary medication order, Xander "would … be able to refuse medications and then decompensate further."  She acknowledged, however, that although Xander had refused medications at times in the past, he had not done so during the previous year.

¶14     In an oral ruling, the circuit court concluded that Xander was mentally ill, dangerous, and a proper subject for treatment.  With respect to dangerousness, the court stated both Bales and Nyman had testified that Xander engaged in "violent outbursts," and Nyman had testified about "aggression toward staff and peers within the past year."  The court also referenced Xander's polydipsia, "which apparently causes him to take too much fluid in, and he has to have his fluid monitored all the time in order to make sure that he doesn't take in

too much, and then he gets particularly irritable when he has." The court then concluded:

> I do believe that based upon the aggression that he has shown towards others that appears to be—well, it flares up right before he gets his injectable medication and then it's under control after he receives it. Based upon those, I think that there's clear evidence that dangerousness, that he would be recommitted if the commitment were withdrawn, and I think he would imminently evidence such impaired judgment that there would be a substantial probability of injury to himself or others. And additionally, I also think that imminently if we withdrew the commitment, there would be evidence that he would be unable to satisfy his basic needs for nourishment, medical care, shelter, other safety.

¶15 The circuit court acknowledged that Xander was subject to a guardianship. The court reasoned, however, that both Bales and Nyman "testified he really needs constant supervision to ensure his medical needs including that polydipsia as well as his mental health needs are properly taken care of, so he needs that really high level of supervision to ensure that he has all of that taken care of." On these facts, the court stated the County had proved by clear and convincing evidence that "if we withdraw the commitment … he would meet the elements for commitment once again." The court further found that Xander was not competent to refuse medication.

¶16 On May 6, 2020, the circuit court entered a written order extending Xander's WIS. STAT. ch. 51 commitment for a period of one year, as well as an order for involuntary medication and treatment during the period of his

commitment. Xander now appeals, challenging the sufficiency of the evidence to support the court's determination regarding dangerousness.[4]

## DISCUSSION

### I. Mootness

¶17    As an initial matter, the County asserts that this appeal is moot. Mootness presents a question of law that we review independently. ***Portage Cnty. v. J.W.K.***, 2019 WI 54, ¶10, 386 Wis. 2d 672, 927 N.W.2d 509. "An issue is moot when its resolution will have no practical effect on the underlying controversy." ***Id.***, ¶11 (citation omitted). We generally decline to address moot issues, and if all issues on appeal are moot, the appeal should be dismissed. ***Id.***, ¶12.

¶18    The County argues Xander's appeal is moot because the orders he challenges were entered on May 6, 2020, and therefore expired on May 6, 2021. An appeal from an expired commitment order is moot, unless the order results in collateral consequences that persist even after the order has expired. *See **id.***, ¶¶14, 28 & n.11; ***Marathon Cnty. v. D.K.***, 2020 WI 8, ¶¶22-25, 390 Wis. 2d 50, 937 N.W.2d 901. Xander contends that even though the May 6, 2020 orders have expired, he remains subject to a variety of collateral consequences stemming from those orders. In response, the County asserts that Xander's alleged collateral consequences are speculative, as Xander has not shown that those consequences

---

[4] Xander appeals both the circuit court's order extending his commitment and the court's order for involuntary medication and treatment. He does not, however, raise any arguments specifically pertaining to the involuntary medication order. Nonetheless, Xander correctly notes that reversal of the order extending his commitment would also result in the reversal of the involuntary medication order, as the involuntary medication order is tied to the existence of a lawful commitment. *See* WIS. STAT. § 51.61(1)(g)3.

were caused by the May 6, 2020 orders specifically, as opposed to Xander's many prior commitment orders.

¶19     We need not address the issue of collateral consequences.  Assuming without deciding that Xander's appeal is moot, we nevertheless choose to address the merits of his arguments.  An appellate court may elect to address a moot issue if any of the following exceptions applies: (1) the issue is of great public importance; (2) the constitutionality of a statute is involved; (3) the issue arises so often that a definitive decision is essential to guide circuit courts; (4) the issue is likely to arise again and should be resolved to avoid uncertainty; or (5) the issue is capable and likely of repetition, yet evades review.  *J.W.K.*, 386 Wis. 2d 672, ¶12.

¶20     Multiple exceptions to the mootness doctrine apply in this case. First, Xander's appeal presents an issue of great public importance—namely, what evidence a petitioner must present to establish dangerousness under WIS. STAT. § 51.20(1)(a)2.c. when the individual is also subject to a protective placement under WIS. STAT. ch. 55.  We addressed a similar issue in *Dane County v. Kelly M.*, 2011 WI App 69, ¶¶1-3, 333 Wis. 2d 719, 798 N.W.2d 697, but that case pertained to the standard of dangerousness set forth in § 51.20(1)(a)2.e., not § 51.20(1)(a)2.c.  We therefore agree with Xander that this appeal presents a novel legal issue, and one that "implicates the weighty liberty interests of every individual under guardianship and protective placement."

¶21     Second, the issue presented by this appeal is likely to arise again in other cases in which petitioners seek WIS. STAT. ch. 51 commitments of individuals who are also subject to protective placements under WIS. STAT. ch. 55. The proper application of the ch. 55 exclusion in WIS. STAT. § 51.20(1)(a)2.c. should therefore be resolved to avoid uncertainty in future cases.

9

¶22    Finally, the issue in this appeal is capable and likely of repetition, yet evades review.  The "capable of repetition, yet evading review" doctrine "is limited to situations involving 'a reasonable expectation that the same complaining party would be subjected to the same action again.'"  ***J.W.K.***, 386 Wis. 2d 672, ¶30 (citation omitted).  The County argues this exception does not apply because "the issue in this case is the sufficiency of the evidence from the hearing on May 6th 2020, [and] it would be impossible to subject [Xander] to the same hearing again.  He could only be subjected to a subsequent extension which is separate and distinct from the action at issue in this case."

¶23    Be that as it may, there is no evidence in the record to indicate that Xander is no longer subject to a WIS. STAT. ch. 55 protective placement.  Thus, in the event the County later seeks to extend Xander's existing WIS. STAT. ch. 51 commitment or files a new commitment petition, the same legal issue regarding the ch. 55 exclusion in WIS. STAT. § 51.20(1)(a)2.c. will likely arise again.  Moreover, given that original commitment orders last a maximum of six months and extension orders last up to twelve months, we agree with Xander that the issue presented by this appeal is likely to evade review because, in most cases, it is simply not possible to complete appellate review before a commitment order expires.  For these reasons, assuming without deciding that Xander's appeal is moot, we nevertheless elect to address the merits of his arguments.

## II.  Sufficiency of the evidence

¶24    To involuntarily commit an individual under WIS. STAT. ch. 51, the petitioner has the burden to show by clear and convincing evidence that the individual is: (1)  mentally ill;  (2)  a proper subject for treatment;  and (3) dangerous to himself or herself or to others.  WIS. STAT. § 51.20(1)(a)1.-2.,

(13)(e), (13)(g)3. In this case, Xander does not dispute that the County established the first two of these elements. He argues, however, that the County failed to present sufficient evidence to establish that he is dangerous.

¶25 Whether the County met its burden of proof to support the extension of Xander's commitment presents a mixed question of fact and law. *See Waukesha Cnty. v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. We uphold the circuit court's findings of fact unless they are clearly erroneous, but whether the facts satisfy the statutory standard is a question of law that we review independently. *Id.*

¶26 WISCONSIN STAT. § 51.20(1)(a)2. sets forth five ways in which a petitioner may establish that an individual is dangerous.[5] Here, the circuit court concluded Xander was dangerous under § 51.20(1)(a)2.c. and d.[6] On appeal,

---

[5] Each of the dangerousness standards in WIS. STAT. § 51.20(1)(a)2. requires the petitioner to "identify recent acts or omissions demonstrating that the individual is a danger to himself [or herself] or to others." *Portage Cnty. v. J.W.K.*, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509; *see also* § 51.20(1)(a)2.a.-e. However, in a recommitment proceeding, the dangerousness requirement may instead be satisfied "by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Sec. 51.20(1)(am). Nevertheless, even when applying the recommitment standard set forth in § 51.20(1)(am), a circuit court is required to ground its decision regarding dangerousness in one or more of the standards set forth in § 51.20(1)(a)2. *D.J.W.*, 391 Wis. 2d 231, ¶¶40-45.

In this case, the circuit court acknowledged that WIS. STAT. § 51.20(1)(am) "does relieve the burden essentially of proving a recent overt act, attempt, or threat to act if you can show that there's a substantial likelihood based upon the treatment record that the individual would be a proper subject for commitment if treatment were withdrawn." Regardless, the court stated that it was limiting its analysis of Xander's dangerousness to events that had occurred "within the past year since the last recommitment hearing."

[6] Although the circuit court did not refer to the applicable subdivision paragraphs of WIS. STAT. § 51.20(1)(a)2. by letter, it is clear from the court's oral ruling that it found Xander dangerous under § 51.20(1)(a)2.c. and d.

11

Xander argues the evidence at the extension hearing was insufficient to support a determination that he was dangerous under either of those subdivision paragraphs. In response, the County argues the evidence was sufficient to support a determination of dangerousness under subd. para. c., but it does not address Xander's argument regarding subd. para. d. We therefore deem the County to have conceded that the evidence was insufficient to establish dangerousness under subd. para. d., and we confine our analysis to the sufficiency of the evidence under subd. para. c.[7] *See* ***Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.***, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).

¶27 WISCONSIN STAT. § 51.20(1)(a)2.c. provides that an individual is dangerous if he or she "[e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals." The statute further states, however, that "[t]he probability of physical impairment or injury is not substantial … if the individual may be

---

[7] In addition to arguing that the evidence was sufficient to establish dangerousness under WIS. STAT. § 51.20(1)(a)2.c., the County also argues that it presented sufficient evidence to establish dangerousness under § 51.20(1)(a)2.b. As Xander correctly notes, however, the circuit court did not find him dangerous under subd. para. b. We agree with Xander that because the court did not make "specific factual findings with reference to" subd. para. b., affirming the extension of his commitment based on that subdivision paragraph would require us to engage in "guesswork" and would therefore be improper. *See* ***D.J.W.***, 391 Wis. 2d 231, ¶¶44-45. As such, we decline to address the County's argument regarding subd. para. b.

12

provided protective placement or protective services under ch. 55."[8] Sec. 51.20(1)(a)2.c.

¶28    The circuit court did not expressly address the WIS. STAT. ch. 55 exclusion in WIS. STAT. § 51.20(1)(a)2.c. when determining whether Xander was dangerous under that subdivision paragraph.  In particular, the court did not address the effect of Xander's ch. 55 protective placement on the County's burden to prove that a "substantial probability" of harm existed as required by subd. para. c.  In his brief-in-chief on appeal, Xander argues that because he is subject to a protective placement, the ch. 55 exclusion necessarily applies to him, and, as a result, the court could not find him dangerous under subd. para. c. as a matter of law.

¶29    In response, the County argues the mere fact that Xander is subject to a protective placement does not end the analysis of whether the WIS. STAT. ch. 55 exclusion in WIS. STAT. § 51.20(1)(a)2.c. applies to him.  Instead, the County argues we should follow the analysis set forth in *Kelly M.*  The County further asserts that the *Kelly M.* analysis compels a conclusion that the ch. 55 exclusion in subd. para. c. does not apply here.  In his reply brief, Xander agrees that the *Kelly M.* analysis is applicable in this case, but he asserts *Kelly M.* actually

---

[8]    Although we deem the County to have conceded that the evidence at the extension hearing was insufficient to establish dangerousness under WIS. STAT. § 51.20(1)(a)2.d., we observe that like subd. para. c., subd. para. d. requires the petitioner to prove a "substantial probability" of harm and further provides that no such substantial probability exists "if the individual may be provided protective placement or protective services under ch. 55." Sec. 51.20(1)(a)2.d.  Accordingly, while we do not address the sufficiency of the evidence under subd. para. d., we see no reason why our analysis of the WIS. STAT. ch. 55 exclusion in subd. para. c. would not also apply to subd. para. d.

supports a conclusion that the court erred by finding him dangerous under subd. para. c.

¶30    Kelly M. was already subject to a guardianship and a protective placement under WIS. STAT. ch. 55 when Dane County filed a petition to involuntarily commit her under WIS. STAT. ch. 51. *Kelly M.*, 333 Wis. 2d 719, ¶4. The circuit court granted the County's petition after finding Kelly dangerous under WIS. STAT. § 51.20(1)(a)2.e., which is commonly known as the "fifth standard" of dangerousness. *Kelly M.*, 333 Wis. 2d 719, ¶¶1, 6. The fifth standard applies when, among other things, there is a

> substantial probability that [the subject individual] will, if left untreated, lack services necessary for his or her health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or her thoughts or actions.

Sec. 51.20(1)(a)2.e. The fifth standard also provides, however, that "[t]he probability of suffering severe mental, emotional, or physical harm is not substantial … if the individual may be provided protective placement or protective services under ch. 55." Sec. 51.20(1)(a)2.e.

¶31    On appeal, Kelly argued that because she was subject to a protective placement under WIS. STAT. ch. 55, she could not, as a matter of law, be found dangerous under WIS. STAT. § 51.20(1)(a)2.e. *Kelly M.*, 333 Wis. 2d 719, ¶19. Stated differently, Kelly argued that "for any person eligible for or already subject to protective placement or services under … ch. 55, there can never be a substantial probability of the requisite harm" for purposes of the fifth standard. *Kelly M.*, 333 Wis. 2d 719, ¶19.

¶32    We rejected Kelly's interpretation of WIS. STAT. § 51.20(1)(a)2.e., reasoning that it was inconsistent with the purpose of the WIS. STAT. ch. 55 exclusion—i.e., "to avoid commitment for treatment if it is reasonably probable … that placement or services available under … ch. 55 will provide the needed treatment." *Kelly M.*, 333 Wis. 2d 719, ¶¶21-22.  We explained that it would be unreasonable "to preclude persons from being committed for treatment under the fifth standard simply because they are or could be the subject of a … ch. 55 order even if the placement or services available under ch. 55 would not reduce the probability of 'severe mental, emotional, or physical harm.'" *Kelly M.*, 333 Wis. 2d 719, ¶22 (quoting § 51.20(1)(a)2.e.).

¶33    Nevertheless, we also rejected the County's position that the WIS. STAT. ch. 55 exclusion in WIS. STAT. § 51.20(1)(a)2.e. "mean[s] that the probability of harm is not substantial … only if the person's *existing* protective placement or services are effective to meet the person's needs."  *Kelly M.*, 333 Wis. 2d 719, ¶¶20, 24.  We instead concluded that the ch. 55 exclusion applies both to individuals who are eligible for, but not yet subject to, ch. 55 orders, and individuals who are "already subject to an order for protective placement or services, if there is another placement or additional services available under … ch. 55 that would be effective in reducing the probability of the requisite harm to less than a substantial probability."  *Kelly M.*, 333 Wis. 2d 719, ¶32.  We further concluded that "involuntary administration of medication under [WIS. STAT.] § 55.14 may be one of the additional services that would satisfy this exclusion, if the [individual's] guardian consents and depending on the individual's circumstances." *Kelly M.*, 333 Wis. 2d 719, ¶32.

¶34    As noted above, both Xander and the County assert that the *Kelly M.* analysis is applicable in this case, even though *Kelly M.* addressed the fifth

standard of dangerousness—WIS. STAT. § 51.20(1)(a)2.e.—rather than § 51.20(1)(a)2.c. We agree that *Kelly M.* provides the applicable framework for our analysis. The WIS. STAT. ch. 55 exclusion in subd. para. c. is identical to the ch. 55 exclusion in subd. para. e. Both exclusions state that the probability of the requisite harm is not substantial "if the individual may be provided protective placement or protective services under ch. 55." *See* § 51.20(1)(a)2.c., e. We see no reason why *Kelly M.*'s analysis of the ch. 55 exclusion in subd. para. e. would not be equally applicable to the identical exclusion in subd. para. c.

¶35 Applying the *Kelly M.* framework to this case, we reject Xander's original argument that because he is subject to a protective placement under WIS. STAT. ch. 55, he cannot, as a matter of law, be found dangerous under WIS. STAT. § 51.20(1)(a)2.c. Instead, the dispositive question under *Kelly M.* is whether there are services available to Xander under ch. 55 "that would be effective in reducing the probability of the requisite harm to less than a substantial probability." *See Kelly M.*, 333 Wis. 2d 719, ¶32.

¶36 The County failed to present any evidence that no such services were available to Xander under WIS. STAT. ch. 55, nor did the circuit court make any findings to that effect. Again, in order to extend Xander's commitment, the County had the burden to prove that he was dangerous by clear and convincing evidence. *See* WIS. STAT. § 51.20(1)(a)2., (13)(g)3. Thus, under § 51.20(1)(a)2.c., the County had the burden to prove there was a "substantial probability" of physical impairment or injury to Xander or others. Because subd. para. 2.c. provides that no such "substantial probability" exists "if the individual may be provided protective placement or protective services under [WIS. STAT.] ch. 55," and because the undisputed evidence at the extension hearing showed that Xander was under a ch. 55 protective placement, it was the

16

County's burden to show that the protective placement and associated services under ch. 55 were not enough to reduce the probability of harm below a substantial probability.[9]

¶37    The County failed to meet its burden.  Bales testified that "even with protective placement and even with medications," Xander "still has these occasional episodes that occur …. [T]hat is why he needs continued oversight." However, Bales did not explain what additional "oversight" was available under a WIS. STAT. ch. 51 commitment that was not also available under ch. 55.  Bales conceded that Xander was "well placed" in a group home pursuant to his protective placement, and he did not suggest that a higher level of confinement under ch. 51 was necessary or appropriate to meet Xander's needs—such as placement in a locked or unlocked inpatient facility.

¶38    Moreover, the County failed to present any evidence that an involuntary medication order under WIS. STAT. § 55.14 would not be effective in reducing the probability of harm under WIS. STAT. § 51.20(1)(a)2.c. to less than a substantial probability.  In their testimony, both Bales and Nyman emphasized that extending Xander's WIS. STAT. ch. 51 commitment was necessary, despite his protective placement, because Xander would be dangerous if not subject to an involuntary medication order.  Bales testified, for instance, that although Xander is "well placed" in a group home under his protective placement, "the commitment provides extra support and safety for him *and the medication order*."  (Emphasis added.)  Bales also expressed concern that Xander has to be reminded by group

---

[9] The County does not develop any argument on appeal that Xander had the burden to prove the WIS. STAT. ch. 55 exclusion in WIS. STAT. § 51.20(1)(a)2.c. applied to him, rather than the County having the burden to prove that exclusion did not apply to Xander.

home staff to take his medications and "certainly will not take [them] on his own free will."

¶39    Nyman, in turn, testified that although Xander had not refused medications during the prior year and could continue to receive reminders to take his medications under his protective placement, the "concern" was that without the WIS. STAT. ch. 51 commitment and associated involuntary medication order, Xander "would … be able to refuse medications and then decompensate further." Thus, Bales and Nyman both tied the need for an extension of Xander's ch. 51 commitment to the continued need for an involuntary medication order under that chapter.   Neither witness, however, testified as to whether Xander's need for medication could be addressed by a medication order under WIS. STAT. § 55.14.

¶40    As a general matter, a circuit court may enter a medication order under WIS. STAT. § 55.14 if the individual's guardian consents; if the individual is not competent to refuse psychotropic medication; and if without that medication, the individual will present a substantial probability of physical harm to himself or herself or to others.  *See* § 55.14(2), (3).  In addition, there must be a showing that the individual has refused to take the medication voluntarily, or that efforts to administer the medication voluntarily would not be feasible or in the individual's best interest.  Sec. 55.14(3)(c).

¶41    Here, the County presented no evidence indicating that it would be unable to obtain a medication order under WIS. STAT. § 55.14 as part of Xander's protective placement.  The County did not, for instance, present evidence that Xander's guardian would not consent to the entry of such an order.  Nor did the County show that it had previously attempted, but failed, to obtain a medication order under § 55.14.  The County therefore failed to meet its burden to prove that a

§ 55.14 medication order would not be effective in reducing Xander's risk of harm under WIS. STAT. § 51.20(1)(a)2.c. to less than a substantial probability. We agree with Xander that, under these circumstances, the County failed to present sufficient evidence to support a finding that he was dangerous under subd. para. c. As such, we reverse the circuit court's May 6, 2020 orders extending Xander's commitment and subjecting him to involuntary medication and treatment.

¶42    We acknowledge that in *Kelly M.*, the circuit court did not rule on the applicability of the WIS. STAT. ch. 55 exclusion or make any findings as to whether an involuntary medication order under WIS. STAT. § 55.14 would reduce Kelly's probability of harm below the substantial probability threshold. *Kelly M.*, 333 Wis. 2d 719, ¶33. In addition, the evidence in *Kelly M.* did not indicate whether Kelly's guardian would have consented to an involuntary medication order. *Id.* Under those circumstances, we stated in *Kelly M.* that the appropriate remedy would normally be to remand for further proceedings on the applicability of the ch. 55 exclusion. *Kelly M.*, 333 Wis. 2d 719, ¶33. We concluded, however, that a remand for further proceedings was unnecessary because Kelly had recently died. *Id.*

¶43    We agree with Xander that, in this case, a remand for further proceedings would be inappropriate for two reasons. First, our review of the evidence presented at the extension hearing shows that the County did not introduce any evidence regarding the availability of additional services under WIS. STAT. ch. 55 that would reduce Xander's risk of harm below the substantial probability threshold needed to find him dangerous under WIS. STAT. § 51.20(1)(a)2.c. In particular, the County did not introduce any evidence as to the availability of a medication order under WIS. STAT. § 55.14. A remand for the circuit court to make findings on those issues based upon the existing record

would therefore serve no purpose, as there is simply no evidence in the record pertaining to them.

¶44     Second, a circuit court "must hold a hearing on [a] petition for extension [of a WIS. STAT. ch. 51 commitment] before the previous order expires or it loses competency to extend the commitment." *J.W.K.*, 386 Wis. 2d 672, ¶20. The commitment order that preceded the extension order at issue in this appeal expired on May 11, 2020.  As a result, if we were to reverse and remand for further proceedings on the County's petition to extend Xander's commitment, the circuit court would lack competency to conduct those proceedings.  On these facts, we conclude the appropriate course of action is to reverse the court's May 6, 2020 orders outright, rather than remanding for further proceedings regarding the applicability of the WIS. STAT. ch. 55 exclusion.

*By the Court.*—Orders reversed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.